IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| OPUS FUND SERVICES (USA) LLC, | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 17 C 923 |
| v. | ) ) | Judge Sharon Johnson Coleman |
| THEOREM FUND SERVICES, LLC, STEPHEN GIANNONE, MIKHAIL DAVIDYAN, MELISSA BOCKWINKEL, and ELIZABETH WRIGHT, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Opus Fund Services (USA) LLC ("Opus") filed a ten count Amended Complaint against Theorem Fund Services LLC ("Theorem") and individual defendants Stephen Giannone, Mikhail Davidyan, Melissa Bockwinkel, and Elizabeth Wright for violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and several state law claims. Melissa Bockwinkel moves to dismiss the complaint against her pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Defendants also move to dismiss the complaint entirely pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim [33]. For the reasons set forth below, this Court the motions are granted in part and denied in part.

**Background**

The following facts are taken from the Amended Complaint. (Dkt. 32). Opus is a full-service, domestic, and international fund administrator with offices in New York, Chicago, San Francisco, and Bermuda. Opus is a Delaware Limited Liability Company ("LLC") with its principal place of business in Bermuda. Theorem is an Illinois LLC with its principal place of business in

1

Chicago. Stephen Giannone was a senior executive at Opus until he resigned on September 30, 2015. After resigning from Opus, Giannone founded Theorem, a competing company. Mikhail Davidyan is a former Senior Vice President at Opus. Elizabeth Wright is a former Senior Vice President at Opus.

Melissa Bockwinkel is a former Senior Vice President at Opus and was an executive at Opus in its Illinois office prior to her move to Oregon in 2013, where she continued to work remotely for Opus through its Illinois office. (Dkt. 32, at ¶13). Bockwinkel also worked for Theorem through its Illinois office. *Id.* In her affidavit submitted to contest personal jurisdiction in Illinois, Bockwinkel states that she has resided in Portland, Oregon since January 2013. She worked for Opus as an account manager from 2009 to 2013, when she resigned from the position. From March 2014 to October 2015, Bockwinkel worked for Opus as a Senior Vice President. Bockwinkel avers that she performed all her work for Opus since January 2013 in Oregon. She further asserts that she owns no real estate in Illinois nor does she transact any business in Illinois and her only continuing contacts with the state are personal and familial. Bockwinkel states that she was never an employee of Theorem, but only briefly provided consulting services from February to May 2016.

The Amended Complaint alleges that in August 2015, Giannone was negotiating potential employment with Perennial, a competitor of Opus. (*Id.* at ¶ 20). Opus alleges that, prior to his departure from Opus, Davidyan accessed Opus' iSymphony platform and took confidential proprietary information and trade secrets. During this time, Giannone was negotiating with Thiele Capital to bring its fund administration services to Opus. Thiele Capital took its business to Perennial and then Theorem instead of signing on with Opus.

On September 8, 2015, Giannone traveled to New York City, billing his expenses to Opus. Opus alleges that, while there, Giannone met with a Perennial executive, bringing along an Opus

Senior Vice President and Head of Sales.[1] On September 23, 2015, Opus paid for Giannone to travel to California, instead of conducting Opus business, he met with Perennial personnel. Giannone resigned from Opus on September 30, 2015, giving 30-days' notice. When he resigned, Opus told Giannone to stay away from the office and not to conduct any business on behalf of Opus and to refrain from speaking to any clients or other employees of Opus. Giannone accessed or tried to access iSimphony after his resignation and without authorization three times on October 5, 2015, and again on January 4, 2016.

Davidyan resigned from Opus on September 4, 2015, giving 26-days' notice before joining Perennial. Bockwinkel resigned from Opus on September 21, 2015, giving two weeks' notice and joining Perennial. Opus alleges that prior to her departure from Opus, Bockwinkel accessed its iSymphony platform to obtain proprietary information, including manuals and contracts. On October 9, 2015, Opus promoted Wright to the position of Senior Vice President, Fund Accounting, a role that was intended to replace the vacancies left by both Davidyan and Bockwinkel.

On October 26, 2015, Mauka Capital notified Opus of its intent to terminate the services of Opus in favor of Perennial. Giannone and Davidyan attended a symposium on November 18, 2015, with Perennial nametags. Giannone, Davidyan, and Bockwinkel left Perennial in January 2016. On January 29, 2016, Theorem was registered in Illinois with Giannone and Davidyan as members. Theorem announced its launch on February 16, 2016, with an article posted to HFM (a website publishing news in the fund management industry). Opus alleges that Giannone made a disparaging comment about Opus in this article.

On May 31, 2016, Wright resigned from Opus with no notice and joined Theorem. Opus alleges that Wright improperly accessed the iSymphony platform to take Opus' confidential proprietary information and trade secrets, including client referral sources, business prospects, future

---

[1] Although the Opus Head of Sales is identified in the Amended Complaint, as attending a meeting in New York City with Perennial, he is not a defendant.

business development plans, and proprietary client information, manuals and contracts. On July 21, 2016, Lindsey Vertin gave two weeks notice to Opus and joined Theorem.

On August 5, 2016, Opus was negotiating with Ironwood Funding ("Ironwood"), one of its existing clients, to manage Ironwood's new fund. Ironwood decided to give its new business to Theorem. On September 21, 2016, Ironwood gave notice to Opus that it was reassigning all its funds from Opus to Theorem. Also in September 2016, Giananone allegedly slandered Opus to a third-party service provider, assailing Opus' financial and business methods. On September 30, 2016, Ranger Capital Group ("Ranger") notified Opus that it was reassigning two of its four funds from Opus to Theorem. In October 2016, Giannone allegedly solicited Haider Capital one of Opus' biggest clients to move its business from Opus to Theorem.

On May 8, 2017, Opus filed a ten count Amended Complaint, alleging (Count I) breach of fiduciary duty, (Counts II and III) tortious interference with prospective economic advantage, (Count IV) tortious interference with business relations, (Count V and VI) violation of the Defend Trade Secrets Act DTSA 18 U.S.C. § 1832, (Count VII) violation of the Consumer Fraud and Abuse Act 18 U.S.C. § 1030, (Count VIII) defamation *per se*, (Count IX) breach of contract, and (Count X) conversion.

**Legal Standard**

Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). The party asserting personal jurisdiction bears the burden of proof. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). The Court may consider affidavits submitted by the parties when resolving the question of personal jurisdiction. *Id.* at 782. The plaintiff need only establish a prima facie case of personal jurisdiction when the Court rules on the motion without an evidentiary hearing. *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002). Factual disputes and all reasonable inferences are resolved in favor of the

plaintiff at this stage. *Purdue,* 338 F.3d at 782.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering the motion, the Court accepts as true all well pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive dismissal, the complaint must not only provide the defendant with fair notice of a claim's basis, but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim must be plausible rather than merely conceivable or speculative, meaning that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together. But the proper question to ask is still *could* these things have happened, not *did* they happen." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826–27 (7th Cir. 2014) (emphasis in original) (internal citations omitted).

**Discussion**

*1. Personal Jurisdiction*

Defendants move for dismissal of Melissa Bockwinkel as a defendant based on a lack of personal jurisdiction. Defendants claim that Bockwinkel is an Oregon resident and lacks sufficient minimum contacts with Illinois to support personal jurisdiction here. This Court may exercise jurisdiction over Bockwinkel only if authorized both by the United States Constitution and Illinois law. *Be2LLC v. Ivanov,* 642 F.3d 555, 558 (7th Cir. 2011). Illinois's long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id.*; *see* 735 ILCS 5/2-209(c). Thus, the state and federal inquiries merge. *Tamburo v. Dworkin,* 601 F.3d 693, 700 (7th Cir. 2010). Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 425 (7th Cir.

2010). This Court agrees that it does not have general jurisdiction over Bockwinkel.

Specific jurisdiction arises from the "relationship among the defendant, the forum, and the litigation." *Levin v. Posen Foundation,* 62 F.Supp.3d 733, 739 (N.D. Ill. 2014)(Chang, J.) (quoting *Walden v. Fiore,* -- U.S. --, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014)). Specific jurisdiction requires that "(1) the defendant has purposely directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg., LLC v. Greving,* 743 F.3d 487, 492 (7th Cir. 2014) (quoting *Tamburo,* 601 F.3d at 702). "The exercise of specific jurisdiction must also comport with the traditional notions of fair play and substantial justice." *Id.*

According to the Seventh Circuit "contacts supporting specific jurisdiction can take many different forms," but the key is purposefulness. *uBid,* 623 F.3d at 426. Contacts that are random, fortuitous, or attenuated will not support specific jurisdiction. *Id.* Courts have found the following examples of contact sufficient: entering a business contract in the forum state even if the defendant never physically entered the state, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 478-82 (1985); committing an intentional tort outside the forum state but aimed at the forum state, *Calder v. Jones,* 465 U.S. 783, 789-90 (1984); and sending agents and goods to buyers within a forum state, *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). For intentional torts, the intentional conduct must be expressly aimed at the forum with the defendant's knowledge that the effects of the conduct, the injury, would be felt in the forum. *Tamburo,* 601 F.3d at 703-04 (citing *Calder,* 465 U.S. at 789-90).

Plaintiff alleges that Bockwinkel breached her fiduciary duty of loyalty as an executive at Opus, violated DTSA, CFAA, breached the confidentiality agreement portion of her employment contract, and committed conversion through the appropriation or acquisition of trade secret and proprietary confidential information from Opus. Both parties submitted affidavits. Bockwinkel avers

6

that she has resided in Oregon since January 2013 and has not resided in Illinois since September 2012. Dkt. 34-1, Affidavit M. Bockwinkel ¶¶ 5-6. She worked for Opus as a Senior Vice President from March 2014 through October 2015. *Id.* ¶ 7. Bockwinkel also worked for Opus as an account manager from 2009 to 2013. *Id.* ¶ 9. Bockwinkel further states that all of Opus' contact with her was directed to her in Oregon, including receiving the offer letter to become a Senior Vice President. *Id.* ¶¶ 12-14.

Opus provided an affidavit from the Chief Operating Officer of Opus, Mohsen Noursalehi, who was also Bockwinkel's direct supervisor. Dkt. 35-1, Affidavit M. Noursalehi ¶¶ 1, 4. Noursalehi attests that Bockwinkel worked for Opus at its Naperville, Illinois, office from November 1, 2009, through 2013, and from March 1, 2014 through October 21, 2015. *Id.* ¶ 2. From March 1, 2014, to October 21, 2015, Bockwinkel worked remotely from Oregon. *Id.* ¶ 3. During the period in which Bockwinkel worked remotely, she accessed Opus' network through a virtual private network ("VPN"). *Id.* ¶ 5. While employed with Opus, Bockwinkel made numerous daily phone calls and reported to the Naperville offices to perform her duties and responsibilities. *Id.* ¶ 6. She was paid by Opus from Illinois and used her position to access Opus office networks Illinois to acquire data and documents. *Id.* ¶¶ 7-8.

Email communication alone has been sufficient contact to support specific jurisdiction for intentional torts. *See Levin v. Posen Foundation,* 62 F.Supp.3d 733, 740 (N.D. Ill. 2014) (Lefkow, J.) (finding that defendant's communications into Illinois contained the allegedly fraudulent and misleading information on which Levin basis his claim); *see also Triad Capital Mgmt., LLC v. Private Equity Capital Corp.,* No. 07 C 3641, 2008 WL 4104357, at *5 (N.D. Ill. Aug. 25, 2008) (Gottschall, J.) ("[E]ven when contact takes place only via telephone or email, it can create a substantial connection between the defendant and the forum state[.]"). Likewise, in *Numeric Analytics, LLC v. McCabe,* 161 F.Supp.3d 348 (E.D. Penn. 2016), the district found sufficient minimum contacts to support specific

7

jurisdiction on an employment contract claim where the defendant former employees worked remotely outside the forum. The court found that exercising jurisdiction over the defendants did not offend traditional notions of fair play and substantial justice because the defendants knew they were working for a Pennsylvania company and all the essential functions that allowed the defendants to earn a living were channeled through Pennsylvania. *Id.* at 355-56.

Bockwinkel's contacts are sufficient to for this Court to exercise specific jurisdiction without offending traditional notions of fair play and substantial justice. All of the allegations against Bockwinkel stem from employment with Opus. The fact that she worked remotely from Oregon does not mean that she did not regularly access Opus networks in Illinois to carry out her job and communicate regularly with her supervisor Noursalehi and others in Opus' Naperville office. Nothing in Bockwinkel's affidavit indicates otherwise. Moreover, Bockwinkel does not dispute that her relationship with Opus began in Illinois, that she was paid by Opus from Illinois, or that all of the requirements for her to do her job at Opus came from Opus in Illinois. Thus, this Court denies defendants' motion to dismiss Bockwinkel for lack of personal jurisdiction.

*2. Failure to State a Claim*

Defendants also move to dismiss the complaint in its entirety for failure to state a claim pursuant to Rule 12(b)(6). Defendants make six arguments in support of dismissal: (a) Counts I, II, III, and X, are preempted by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065; (b) Counts V and VI fail to state a claim under the Defense of Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832, because DTSA became effective after the allegations of misappropriation here; (c) Count VII fails to state a claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030; (d) Counts IV fails to state a claim for tortious interference with business relations; (e) Count VIII fails to state a claim for defamation per se because there is no allegation that Giannone made a false statement; and (f) Counts IX and X fail to state claims of breach of a confidentiality agreement and conversion.

8

This Court will address each argument in turn.

*(a) ITSA Preemption*

Defendants argue that ITSA preempts Opus' claims for breach of fiduciary duty (Count I), tortious interference with prospective economic advantage (Counts II and III), and conversion (Count X) because each of these claims is premised on trade secret misappropriation. ITSA provides for both injunctive relief for actual or threatened misappropriation and damages for the actual loss caused by the misappropriation. 765 ILCS 1065/3, 4(a). ITSA provides a comprehensive statutory protection for trade secrets, and "is intended to displace conflicting tort, restitutionary, unfair competition, and other law of this State providing civil remedies for misappropriation of a trade secret." *Id.* at § 8. The key to determining if ITSA preempts a claim is whether the claim would lie if the information at issue were not confidential. *IPOX Schuster, LLC v. Nikko Asset Mgmt Co., Ltd.,* 191 F.Supp.3d 790, 802 (N.D. Ill. 2016) (Kennelly, J.); *see also Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404–05 (7th Cir. 2005) ("The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets.").

Here, the claims in Counts I-III and X are preempted by ITSA because the core allegations are based on the misappropriation of confidential information. In Count I, Opus alleges that defendants Giannone, Davidyan, Bockwinkel, and Wright, breached their duty of loyalty to Opus by misappropriating trade secrets and confidential information for the benefit of a competitor. Dkt. 32 at ¶ 52. In Counts II and III, Opus alleges that Giannone, Davidyan, Wright, and corporate defendant Theorem used Opus' trade secrets and confidential information to target and poach Opus' current and prospective clients. *Id.* at ¶¶ 57, 59, 63, 65. In Count X, Opus alleges conversion of confidential and proprietary data. *Id.* at ¶ 101. Thus, it is plainly evident from the allegations in the complaint that none of these claims would exist if the information at issue were not confidential and proprietary. The only exception is Count I as to defendant Giannone only, which alleges that

Giannone also breached his duty of loyalty by actively soliciting employees of Opus to join him at Perennial and Theorem prior to his departing Opus. *Id.* at ¶ 53. Because that allegation does not rely on any trade secret or confidential information ITSA does not preempt it. This Court finds that ITSA preempts the other claims.

    *(b) DTSA*

Defendants argue that Counts V and VI fail to state claims under DTSA because the Act did not become effective until May 11, 2016, after all of the allegations of misappropriation of trade secrets in this case. DTSA provide a civil remedy where a trade secret is misappropriated. 18 U.S.C. § 1832. Prohibited misappropriation under the Act includes both the acquisition of a trade secret and its disclosure. *Id.* at §1839(5)(A)-(B). Partial recovery is available for misappropriation when some act of misappropriation occurs after the effective date. *See Adams Arms, LLC v. Unified Weapon Systems, Inc.,* No. 8:16-cv-1503-T-33AEP, 2016 WL 5391394, at *6 (M.D. Fla. Sept. 27, 2016) (distinguishing between a disclosure theory and an acquisition theory of recovery, and finding that the plaintiff had stated a claim for disclosure occurring after May 11, 2016, but not for the alleged acquisition that occurred prior to the effective date of DTSA.)

Here, Opus appears to be proceeding on an acquisition theory rather than a disclosure theory of misappropriation. There are no specific allegations of disclosure or of trade secrets by any of the individual defendants. There is a vague allegation that Theorem has Opus' proprietary information and is using it. Dkt. 32 at ¶ 82. Yet, that allegation is insufficient to put Theorem on notice of disclosure or use of trade secrets claim because there are no allegations establishing that such use was after the effective date of the Act. Count V alleges that defendants Giannone, Davidyan, Bockwinkel, and Wright each misappropriated Opus' trade secrets prior to their resignations. at ¶ 75, 80. Giannone resigned September 30, 2015. Davidyan resigned September 4, 2015. Bockwinkel resigned September 21, 2015. Only Wright is alleged to have resigned after the

effective date of DTSA. Therefore, a claim for acquisition of trade secrets under DTSA may lie for Wright if she acquired the proprietary information after May 11 and before May 31, 2016. However, there are no such allegations in the current composition of the complaint.

*(c) CFAA*

Defendants move to dismiss Count VII, arguing that it fails to state a claim under the CFAA because civil liability under section 1030(g) because Opus does not identify the particular subsection or subsections of the Act under which Opus is claiming a violation. The conduct proscribed by the statute is set forth in section 1030(g). "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C.A. § 1030(g). Thus, "a person suing under section 1030(g) must prove: (1) damage or loss (2) by reason of (3) a violation of some other provision of section 1030, and (4) conduct involving one of the factors set forth" in subsection (c)(4)(A)(i). *Motorola, Inc. v. Lemko Corp.,* 609 F.Supp.2d 760, 765 (N.D. Ill. 2009) (Kennelly, J.). "[I]n general, to plead a civil cause of action based on a violation of a substantive provision of the CFAA, a plaintiff need only plead damage or loss, not both." *Pascal Pour Elle, Ltd. v. Jin*, 75 F. Supp. 3d 782, 791 (N.D. Ill. 2014) (Durkin, J.). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

First, Opus does not identify which of the factors the conduct involves. In its opposition brief, Opus identifies section 1030(c)(4)(A)(i)(I), stating that defendants' conduct caused "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value." Opus then refers

11

to its allegation that defendants accessed the iSymphony network and caused damages requiring remediation efforts in excess of $5,000.00, the statutory minimum. However, this type of bare bones pleading that merely recites the elements of the claim is insufficient under Rule 8. In *Pascal Pour Elle,* the defendant challenged the plaintiff's pleading of "loss" under the CFAA and the court found that the plaintiff had adequately pleaded loss by alleging costs associated with conducting an investigation and security assessment in response to a suspected violation of the CFAA. 75 F. Supp. 3d at 791. That is more specific than here, where Opus merely refers to remediation efforts without stating what efforts. Thus, this Court finds that Opus fails to state a claim under the CFAA because the allegations simply track the language of the statute.

(d) *Tortious Interference with a Business Relationship*

Defendants allege that Count IV fails to state a claim for tortious interference with business relations against Giannone. In order to state a claim for tortious interference with a business relationship, the plaintiff must allege: (1) the existence of a valid business relation or expectancy; (2) defendants' knowledge of the plaintiff's relationship or expectancy; (3) purposeful interference by the defendant that prevents it from happening or terminates the relationship; and (4) damages as a result. *Int'l Marketing, Ltd. v. Archer–Daniels–Midland Co., Inc.,* 192 F.3d 724, 731 (7th Cir.1999) (quoting *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 484 (1998)).

Opus relies on *MS Produce, Inc. v. Burger King Corp.*, No. 02C8372, 2003 WL 21087883, at *6 (N.D. Ill. May 12, 2003) (Darrah, J.), to show that it adequately pleaded tortious interference. In that case, the only one cited by the parties addressing a motion to dismiss, the court found that the plaintiff had adequately alleged tortious interference with a business relationship. MS Produce alleged that Burger King in response to pressure from Burger King's purchasing agent and, indirectly, one of its approved distributors, revoked the plaintiff's "approved distributor status" to eliminate competition. The complaint further alleged that Burger King and its purchasing agent were

12

aware of the pending venture between AmeriKing (a large franchisee) and the plaintiff. The court found that it could be reasonably inferred from the allegations in the complaint that Burger King revoked the plaintiff's "approved distributor status" in order to cause AmeriKing not to enter into the proposed joint venture with the plaintiff. The plaintiff also lost other business as a result of the breach by AmeriKing. *Id.*

Here, by contrast, Opus alleges that Giannone targeted Opus employees (Davidyan, Bockwinkel, Wright, Hendrickson, and Vertin) and solicited them to work for Perennial and Theorem. Dkt. 32 at ¶¶ 69-71. As for damages, Opus simply alleges that it is damaged by the disruption of its relationship with these employees. Yet, Mr. Hendrickson, for example, did not leave Opus and therefore it is unclear how the relationship was disrupted or what damage could have resulted. *Id.* at ¶ 26. Similarly, the allegations with regard to Ms. Vertin only allege that she gave Opus two weeks' notice prior to joining Theorem. *Id.* at ¶ 41. There are no allegations of Giannone recruiting her nor does the complaint allege what her role at Opus was or once she joined Theorem. With regard to Giannone's recruitment of his co-defendants, the claim is adequately pleaded since the complaint as a whole allows a reasonable inference that Giannone is alleged to have recruited Opus executives to appropriate Opus' trade secrets and clients to form a competitor.

*(e) Defamation Per Se*

Defendants argue that Count VIII fails to state a claim for defamation *per se* because there is no allegation that Giannone made a false statement. To state a claim for defamation, a plaintiff must allege that "the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers,* 234 Ill. 2d 478, 491, 334 Ill. Dec. 624, 917 N.E.2d 450, 459 (2009). "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the

person in the eyes of the community or deters the community from associating with her or him. A statement is defamatory per se if its harm is obvious and apparent on its face." *Id.* (internal citations omitted). Of the five categories of comments that are defamatory *per se*, the only one relevant here relates to the inability or lack of integrity in one's profession. *Id.* at 492. The precise statement alleged to be defamatory need not be recited verbatim in the complaint. *Id.*

Here, the only statement alleged in the complaint appeared in an online article announcing Theorem's launch. Dkt. 32 at ¶ 38. Opus alleges that "Giannone referred in a disparaging way to a company that advertises that it has a 'single platform that does it all and they have one price,' but alleges in the article that this company is misleading its customers." *Id.* Opus refers to itself in the industry as "One Platform – One Price." *Id.* From these allegations it is reasonable to infer that people in the industry would understand Giannone to be referring to Opus despite him never referring to Opus by name. These allegations are sufficient to state a claim for defamation *per se*.

*(f) Confidentiality Agreements and Conversion*

Defendants argue that Counts IX and X fail to state claims of breach of a confidentiality agreement and conversion. In Count IX Opus alleges that Davidyan, Bockwinkel, and Wright breached confidentiality agreements with Opus, which required them to refrain from disclosing to third parties the customers, contacts, contracts, and other information confidential for a period of twelve months following separation. Dkt. 32 at ¶ 96. Copies of the agreements signed by defendants are attached to the complaint. Under Illinois law, a confidentiality agreement can be enforced only if: "(1) the chronological and geographical limitations are reasonable; (2) the information sought to be protected is, in fact, confidential; and (3) the restriction is reasonably necessary for the protection of a legitimate proprietary interest." *Disher v. Fulgoni*, 124 Ill. App. 3d 257, 262, 464 N.E.2d 639, 643 (1984).

Defendants argue that the agreements are unenforceable because they are overbroad and

unlimited geographically and in duration. The agreements are limited in duration to twelve months following separation on all provisions except the non-disclosure of confidential information. Dkt. 32-1 at 7, sec. 9. There is no geographic limitation. Thus, under Illinois law the non-disclosure agreements are unenforceable. Plaintiff relies on *Saban v. Caremark Rx, LLC,* 780 F.Supp. 2d 700 (N.D. Ill. 2010) (Chang, J.), for the proposition that a non-disclosure agreement of unlimited temporal scope is reasonable in the context of trade secrets. The court in *Saban* was applying Rhode Island law and the court found "the breadth of the non-compete is even further excessive when viewed in light of a confidential-information non-disclosure provision in the employment agreement. The non-disclosure provision helps protect Caremark's legitimate interests, and yet Caremark still drafted a much-too-expansive non-compete." *Saban,* 780 F. Supp. 2d at 713–14. Plaintiff also relies on *Henderson v. U.S. Bank, N.A.,* for the proposition that "where the nondisclosure provision is designed to protect trade secrets or intellectual property, the lack of a time limitation is not fatal." 615 F. Supp. 2d 804, 811 (W.D. Wis. 2009). In that case, the provision was found to not be *per se* unreasonable under Wisconsin law, the court held that the record needed further factual development. *Id.* at 812. Nevertheless that restrictive covenant at issue was limited to U.S. Bank and its affiliates, while not a geographical limitation, is more limited in scope than the provision at issue here. Those cases are therefore unsupportive of plaintiff's position. This Court finds that the unlimited temporal *and* geographic scope is overbroad.

Defendants assert that Count X for conversion should also be dismissed because there was no pre-suit demand. To state a claim for conversion under Illinois law, a plaintiff must allege: (1) unauthorized and wrongful control, dominion, or ownership by defendant over plaintiff's property; (2) plaintiff's right in the property; (3) plaintiff's absolute and unconditional right to the immediate possession of the property; and (4) a demand for possession of the property. *G.M. Sign, Inc. v. Stergo*, 681 F. Supp. 2d 929, 931 (N.D. Ill. 2009) (citing *General Motors Corp. v. Douglass,* 206 Ill.App.3d 881,

151 Ill.Dec. 822, 565 N.E.2d 93, 97 (1990)).

Opus contends that its earlier lawsuit filed in Bermuda constitutes a demand. While the Illinois Supreme Court has not expressly ruled that filing a lawsuit is sufficient to meet the demand element, here, as in *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016), "there is no persuasive indication that the Illinois Supreme Court would rule that filing a lawsuit was sufficient to meet the demand element of a conversion claim." Moreover, according to Illinois law "an action for conversion ... must include a demand for possession or it cannot be said there has been a deprivation." *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1060 (7th Cir. 1988); *see also Rybak v. Dressler*, 178 Ill. App. 3d 569, 588, 532 N.E.2d 1375, 1387 (1988); *A.T. Kearney, Inc. v. INCA International, Inc.,* 132 Ill.App.3d 655, 87 Ill. Dec. 798, 806, 477 N.E.2d 1326, 1334 (1985). Opus fails to allege that it made a pre-lawsuit demand for the property at issue and thus has failed to state a claim for conversion.

**Conclusion**

Based on the foregoing, this Court grants in part and denies in part defendants' Motion to Dismiss [33]. The Motion is denied with respect to Bockwinkel's personal jurisdiction, Count I against Giannone only, and Counts IV and VIII. Because the Court grants plaintiff leave to file an Amended Complaint consistent with this opinion, it need not address defendants' alternative argument for a more definite statement. Counts I-III, V-VII, and IX-X are dismissed without prejudice. Plaintiff is granted leave to amend the complaint consistent with this Opinion within 21 days.

IT IS SO ORDERED.

ENTERED:

Dated: <u>September 29, 2017</u>

SHARON JOHNSON COLEMAN
United States District Judge