IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Opus Fund Services (USA) LLC, | ) | |
| | ) | |
| Opus, | ) | Case No. 17-cv-00923 |
| | ) | |
| | ) | |
| v. | ) | Honorable Sharon Johnson Coleman |
| | ) | |
| | ) | Magistrate Judge Maria Valdez |
| Theorem Fund Services, LLC, Stephen Giannone, | ) | |
| Mikhail Davidyan, Melissa Bockwinkle, Elizabeth | ) | |
| Wright, | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants Theorem Fund Services, LLC ("Theorem"), Stephen Giannone, Mikhail Davidyan, Melissa Bockwinkle, Elizabeth Wright, by their attorneys, submit this reply in support of their Motion to Dismiss Counts II, III and IV of Opus Fund Services (USA) LLC's ("Opus") Second Amended Complaint (ECF DOC.#49) pursuant to Fed. Rule Civ. Procedure 12(b)(6).

**INTRODUCTION**

Opus alleges that two of its existing clients transferred business to defendant Theorem approximately one year after its former employee, defendant Giannone, left Opus and thereafter formed defendant Theorem, a "direct competitor" of Opus. (Second Amended Complaint, "SAC" ¶¶ 4-5, 41-43). Opus claims that prior to each of the four individual defendants' departure from Opus, each "absconded" with "confidential proprietary data and trade secrets" identified as "business/client referral sources", "business prospects", "future business development plans", unspecified "proprietary client information", unnamed "proprietary manuals" and "contracts." It does not allege how each of these individuals stole or used Opus's "trade secrets" in transacting with the two Opus clients who months later placed business with

1

Theorem, or how any of these "trade secrets" were "used for the benefit" of Theorem, in general. Indeed, Opus does not, and apparently cannot, allege who took what, where, when or how. Nevertheless, Opus maintains that its vague, general allegations, identical as to all of the defendants, adequately state claims for trade secret misappropriation in violation of the Defense of Trade Secrets Act ("DTSA"), the Illinois Trade Secrets Act ("ITSA") and the Computer Fraud Abuse Act ("CFAA") against each individual. Opus's position is unsustainable.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Tagami v. City of Chicago*, 14 CV 9074, 2016 WL 397322, at *2 (N.D. Ill. Feb. 1, 2016)(Coleman, J.); citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when its factual content allows the Court to draw a reasonable inference that the defendants are liable for the misconduct alleged. *Id.* As the United States Supreme Court held in *Iqbal*:

> Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, <u>but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions</u>. . . [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But <u>where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,</u> the complaint has alleged—but it has not "show[n]"— "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.

556 U.S. at 678–79 (internal citations omitted)(emphasis added). Courts have recognized that under the Twombly/Iqbal analysis, conclusory allegations are insufficient, and cannot "unlock the door to discovery."

2

In this case, Opus has alleged no more than that defendants at one time worked for Opus, left Opus, and months later formed and/or worked for a competitor, Theorem. There are additional allegations that defendant Giannone solicited Opus' clients following his departure, and that two of Opus' clients transferred or placed business with Theorem many months after he departed from Opus. While each of the defendants is alleged to have "misappropriated" Opus' "trade secrets" – in an identical manner and without variation - Opus does not allege a single fact as to how any "trade secret" was "misappropriated," nor how any of the four individual defendants used any of the alleged "trade secrets." Opus maintains that the conclusory allegations of the Second Amended Complaint ("SAC") suffice to withstand the motion to dismiss because it believes it will obtain factual support for its claims through discovery. But as recognized in *Iqbal*, conclusory allegations cannot "unlock the door" to discovery.

Moreover, none of the six categories of information satisfies the statutory definition of a "trade secret" based on the facts alleged in the SAC, which assert only that these categories of information were stored on a password protected computer platform and that Opus's employees signed confidentiality agreements. If Opus' allegations of "reasonable efforts to remain secrecy" are sufficient to satisfy the statutory definition of a "trade secret" under ITSA and/or DTSA, then any information or data stored on a password protected computer network – which is a standard business practice – by an employer who maintains confidentiality agreements with any of its employees can be deemed a "trade secret." There is no basis to accept this sweeping proposition, and the case law upon which Opus relies does not hold otherwise.

Lastly, Opus argument that it has sufficiently alleged loss to sustain a claim under the Computer Fraud Abuse Act is misplaced. Opus is correct that to establish loss for purposes of civil liability, it can allege damage or loss. But in order to establish the *violation* upon which

civil liability is based, Opus – which elected to invoke Section 1030(a)(5)(B) as the basis of the alleged violation - was required to show <u>actual physical damage</u>, which it has not alleged.

For these reasons Counts II, III and IV of the SAC should be dismissed.

**A.     Conclusory allegations common to all defendants are implausible and otherwise fail to allege misappropriation,**

Opus's allegations of misappropriation are identical as to all defendants: that they "absconded" with the same six "trade secrets." (SAC, ¶¶22, 27, 30, 33). However, the proposition that each of the four individuals "absconded" with the same six categories of data is implausible, warranting dismissal on this basis alone. Defendants cited as support for their position *Chamberlain Group, Inc. v. Techtronic Indus. N. Am., Inc.*, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017)(Tharp, J.), which found that allegations that all seven defendants in that case " committed *every* action" (emphasis in original) upon which the claims was based was "simply implausible" warranting dismissal of the misappropriation claim against those seven defendants. In this case, Opus has alleged that every defendant committed every act constituting "misappropriation" and "solicitation." According to Opus, the four individual defendants "acquired" all six "trade secrets" – (i) "business/client referral sources" (ii) "business prospects"; (iii) "future business development plans"; (iv) "proprietary client information"; (v) "proprietary manuals"; and (vi) "contracts" – and all defendants "used" all of these "trade secrets" to do the same thing: "solicit" Opus' clients and prospective clients. As in *Chamberlain*, this theory is simply implausible, and on this basis alone, Counts II, III and IV should be dismissed.

Rather than address the implausible nature of its claims as pled, Opus maintains it is "not unreasonable to infer" misappropriation by each of the defendants. (Response, p. 5). In support of this position, Opus cites *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 13 C 3767,

4

2013 WL 5974731, at *2 (N.D. Ill. Nov. 11, 2013). However, that case does not stand for the proposition that conclusory allegations of "misappropriation" common to all defendants without distinction are sufficient to withstand dismissal. On the contrary, in that case the plaintiff alleged, on information and belief, specific acts of misappropriation by each of the individual defendants including saving files to external drives and databases after downloading confidential information onto these external drives and databases. The holding in *Lumenate* does not support Opus's assertion that alleging that all of the defendants misappropriated all of the "trade secrets" without distinction or variance is plausible, or that there is some "inference" of misappropriation by each of these defendants.

Indeed, it appears that Opus's theory is that by virtue of the fact the individual defendants once worked for Opus, subsequently left Opus, and months thereafter opened or went to work for a competing business, they necessarily "misappropriated" Opus' "trade secrets." However, merely leaving employment and starting a competing business does not raise an "inference" of misappropriation. Opus cites no authority establishing otherwise.

Opus also maintains that "the SAC does not necessarily allege that defendants engaged in 'identical conduct'" because the defendants are alleged to have resigned at different times. (Response, p. 5). However, regardless of the time of the resignation, all defendants are alleged to have done the same thing prior to their resignation: to have "absconded" with all six categories of "trade secrets." That the exact dates on which each defendant allegedly engaged in this

5

absconding are not specified does not cure the implausible theory presented by these common allegations.[1]

Opus's reliance on *Koh v. Graf,* 11-CV-02605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013) for the proposition that Rule 8(a) "does not require a Opus, without the benefit of discovery to connect every single alleged instance of misconduct in the complaint to every single specific [defendant]" is wholly misplaced (Response, p. 6). In that case, the plaintiff brought suit against three police officers who participated in his extended detainment who were alleged to have "yelled at him, lied to him, manipulated him, and repeatedly accused him wrongfully of his son's murder." *Id.* The court held that group pleading was permissible under the circumstances of that case, which bear no resemblance whatsoever to Opus's claims against its former employees alleging that each stole six categories of "trade secrets." Indeed, the court in *Koh* specifically recognized its holding as limited to the facts of that case finding that disallowing group pleading in factually similar cases "would effectively allow police officers to violate constitutional rights with abandon as long as they ensured they could not be individually identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply." *Id.*, at *4. This holding does not support Opus' position.

Opus asserts that it's pleading burden "corresponds to the amount of information available" (citing *Elmore v. Smith & Nephew, Inc.*, 12 C 8347, 2013 WL 1707956, at *5–6 (N.D. Ill. Apr. 19, 2013) and avers that "the SAC certainly alleges enough facts to raise a reasonable

---

[1] Similarly, the argument that because defendant Wright resigned ten months after defendant Giannone and in that period had been promoted there is an inference she obtained "additional information" does not save the implausible nature of the claims, alleging identical conduct by all defendants at unspecified times. Moreover, additional allegations of access and/or solicitation by defendant Giannone are premised upon the allegations that he, same as the other defendants, misappropriated *all* of the alleged trade secret.

expectation that discovery will reveal evidence and the details regarding each defendants' alleged misappropriation of Opus' trade secrets." (Response, p. 7). Notably, *Elmore* cites *Iqbal*, supra, for the rule that a "complaint that contains only bare legal conclusions will not "unlock the doors of discovery.'" *Id.*, at *5.

In *Elmore*, the plaintiff brought a strict liability action against the manufacturer of a hip implant which alleged to have resulted in her injury. Defendant moved to dismiss on the basis "the occurrence of medical complications after a major surgery does not provide the factual grounding necessary to make a claim plausible." The court rejected this argument finding that allegations of "[t]wo revision surgeries, coupled with increased chromium and cobalt levels in [Opus's] blood, provide sufficient factual grounding on which to base negligence and strict liability claims." Unlike *Elmore*, Opus has not alleged "sufficient factual grounding" to establish that any defendant "misappropriated" and of Opus's alleged "trade secrets" – and allegations that these individuals formed and/or worked for a competitor following their departure from Opus does not provide the requisite "factual grounding."

Because Opus' theory that all defendants engaged in identical conduct is implausible, Counts II, III and IV should be dismissed.

### B. Allegations of Opus' Efforts to Maintain the Secrecy of the "Trade Secrets" are Insufficient.

As explained in *Chamberlain Group* supra:

> Information is secret under the ITSA if "the company must take steps to preserve its secrecy commensurate with the value derived from its secret nature. Under the DTSA, a trade secret is sufficiently secret if the owner thereof has taken reasonable measures to keep such information secret.

2017 WL 4269005, at *6. Opus asserts that because it has alleged that: (1) the "trade secrets" were housed on its password protected computer system; and (2) it required employees to

7

execute confidentiality agreements, Opus has satisfied the requirement that it employ reasonable security measures to maintain the secrecy of its "trade secrets" so as to satisfy the statutory definition of a "trade secret." In effect, Opus's position is that any information on its computer system it unilaterally deems "confidential" is a "trade secret" by virtue of the standard business practice of password protecting its computer network and the existence of confidentiality agreements with its employees. This proposition finds no support in the law upon which Opus relies.

Opus unsuccessfully attempts to distinguish the holding in *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011)(Norgle, J.). There, the court held that the existence of confidentiality agreements does not serve as a sufficient measure to maintain secrecy so as to satisfy the definition of "trade secret." Opus maintains that because it additionally alleged that the "trade secrets" are maintained on a password-protected computer system, "'something more' therefore is alleged here." (Response, p. 8). But courts in this circuit have acknowledged that password protection of computer systems is standard business practice. *Centrifugal Acquisition Corp., Inc. v. Moon*, 849 F. Supp. 2d 814, 831 (E.D. Wis. 2012); citing *Maxpower Corp. v. Abraham,* 557 F.Supp.2d 955, 961 (W.D.Wis.2008). To hold that a meager combination of: (1) maintaining a password-protected computer system (as virtually all businesses do); and (2) the existence of any confidentiality agreement (which standing on its own is an insufficient measure), together establish sufficient measures of maintaining secrecy so as to render information on the computer a "trade secret" would have sweeping implications that would, if allowed, render every bit of information on a business computer a "trade secret" at the business' whim.

Opus relies on cases wherein plaintiffs asserted far more protection than just the existence of a confidentiality agreement. For instance, in *SBS Worldwide, Inc. v. Potts*, 13 C 6557, 2014 WL 499001, at *5 (N.D. Ill. Feb. 7, 2014), the plaintiff alleged four secrecy measures: (i) maintaining a non-disclosure policy; (ii) keeping confidential customer information behind a password-protected intranet; (iii) limiting access to selective employees; and (iv) utilizing "traditional security measures to protect physical documents." Similarly, in *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874–75 (N.D. Ill. 2001), the secrecy of the information was maintained through password-protected computer databases *and* limiting access to select individuals on a "need to know" basis.

In support of its argument that it has alleged reasonable efforts to maintain the secrecy of the information it alleges are "trade secrets," Opus curiously contends that "whether, a customer list constitutes a trade secret '**depends upon factual issues that cannot be decided at the pleading stage, including the amount of effort expended to develop the list and the steps taken to keep it secret.**" (Response, p. 8)(emphasis in original). However, Opus's contention is that anything on its computer system it unilaterally deems confidential is a "trade secret" because of its computer password protection and the existence of confidentiality agreements. There is no "factual issue" regarding a "customer list" (which is not one of the six trade secrets alleged in the SAC).[2] Indeed, there are no additional or disputed facts regarding these efforts, nor does Opus contend otherwise. Opus has alleged the factual basis for its position that its "secrecy" measures meet the statutory definition. These facts are insufficient.

---

[2] For this reason, Opus's reliance on *Lane v. Brocq*, 15 C 6177, 2016 WL 1271051, at *14 (N.D. Ill. Mar. 28, 2016) is misplaced. In that case, plaintiff law firm sufficiently alleged that its client list, maintained on a password protected system limited to less than five employees and staff was a "trade secret." In the present case, the "trade secrets" include six broad categories of information maintained on a computer system accessible to Opus' employees.

Opus also argues that "'courts in this district have consistently found trade secret 'allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms.'" (Response, p. 9). However, the deficiency in Opus's allegations as to its efforts to maintain the secrecy of the alleged "trade secrets" is not that these allegations are "general." Rather, the allegations are specific, but insufficient to satisfy the statutory definition because password protecting a computer system and having confidentiality agreements with employees does not, taken together, constitute a reasonable efforts to maintain the secrecy of all of the information on that system so as to render all information on that system which Opus unilaterally deems "confidential" a "trade secret." Moreover, in *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819 (N.D. Ill. 2014), cited in support of this proposition, the court did not discuss the allegations as to efforts to maintain secrecy of the trade secrets at issue. In *Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*, 14 C 7505, 2015 WL 4945240, at *1 (N.D. Ill. Aug. 19, 2015), also cited, the efforts included marking the alleged trade secrets "patent-pending" and/or "confidential." Neither case supports Opus's position that they have alleged sufficient secrecy measures to satisfy the statutory definition of "trade secret."

Opus cites no case wherein an allegation that general categories of information stored are on a password protected computer system, coupled with allegations of the existence of confidentiality agreements, satisfies the statutory requirement of reasonable efforts to maintain secrecy for purposes of "trade secret" status. This court should decline Opus's invitation to create such precedent.

Because Opus has failed to allege facts satisfying the statutory definition of "trade secret" Counts II and IV should be dismissed.

**C.      Misappropriation Has Not Been Adequately Pled.**

Opus asserts that because defendants once worked for Opus, had access to "trade secrets' at that time, subsequently left Opus and formed and/or joined Theorem, a competitor, and solicited Opus's clients following their departure, it can be inferred, without more, that defendants "misappropriated" Opus' "trade secrets." Opus argues that dismissal on the basis that it has failed to adequately plead misappropriation is not warranted because "defendants had access to Opus' trade secrets during their employment, absent discovery on the issue, Opus is unable to currently determine how and when defendant's improperly accessed or acquired Opus' trade secrets for their or Theorem's own use." (Response, p. 11). As set forth in Section A above, anticipated discovery cannot excuse Opus's admitted failure to plead anything beyond wholly conclusory allegations of misappropriation.

To the extent that Opus's maintains that the misappropriation claims are subject to the "inevitable disclosure" doctrine, this doctrine cannot serve to salvage Opus's conclusory allegations of misappropriation. Opus has alleged no facts which would establish that any defendants will inevitably "disclose" the six categories of "trade secrets" identified. In *Teradyne, Inc. v. Clear Communications Corp.,* 707 F. Supp. 353, 356–57 (N.D. Ill. 1989), the court held that the plaintiff failed to plead "inevitable disclosure" of its former employer's trade secrets:

> Here there is no allegation that defendants have in fact threatened to use [former employer's] secrets or that they will inevitably do so. An allegation that the defendants said they would use secrets or disavowed their confidentiality agreements would serve this purpose. An allegation that [new employer] could not operate without [former employer's] secrets because [former employer's] secret technology is the only one that will work would suffice though more technical facts may be necessarily included in such a pleading. The defendants' claimed acts, working for [former employer], knowing its business, leaving its business, hiring employees from [former employer] and entering the same field (though in a market not yet serviced by [former employer]) do not state a claim of threatened misappropriation.

*Id.*, 356–57. Opus makes no allegation which would support a theory of liability based upon "inevitable disclosure." Opus does not allege that defendants threatened to disclose or use any "trade secret." Opus does not allege that Theorem could not operate without the disclosure or use of any "trade secret." Because there are no allegations supporting 'inevitable disclosure," Opus's invocation of this doctrine cannot sustain Counts II and IV.

Similarly, Opus's reliance on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995) for the proposition that defendants "would be unable to compartmentalize Opus' trade secrets in their new, similar position with Opus' direct competitor" and accordingly their misappropriation claims should be sustained is unavailing (Response, p.13). Plaintiff in *PepsiCo* sought and obtained a preliminary injunction to prevent future disclosure, and this case is therefore procedurally inapposite. Moreover, the facts of that case "lay against a backdrop of fierce beverage-industry competition." 54 F.3d at 1263, There are no facts pled which establish why or how defendants would necessary utilize Opus's "trade secrets" or would be "unable to compartmentalize" the same, nor otherwise support the proposition that Opus has adequately alleged misappropriation pursuant to the "inevitable disclosure" doctrine.

**D.     Count IV fails to allege a violation of Section 1030 (a)(5)(B) of the CFAA.**

Section 1030(g) of the CFAA allows for civil liability under certain circumstances. To state a claim for civil liability under CFAA, a plaintiff must allege "(1) damage or loss; (2) caused by (3) **a violation of one of the substantive provisions set forth in § 1030(a)**, and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)–(VI)." *Maximum Indep. Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630, 636 (N.D. Ill. 2016)(emphasis added). Opus's Response indicates its fundamental misunderstanding of the requirement under

subsection (1) - to show damage or loss - as opposed to the requirement under subsection (3) – to show a "violation" under Section 1030(a).

Opus has alleged a violation of Section 1030(a)(5)(B). (SAC, ¶ 67). Section 1030(a)(5)(B) of the CFAA applies where the alleged violator:

> (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes **damage**;

18 U.S.C.A. § 1030 (West) (emphasis added). "Damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). As recognized in *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 768–69 (N.D. Ill. 2009):

> A plaintiff seeking to recover via section 1030(g) for a violation of section 1030(a)(5) of the CFAA must allege, and ultimately prove, the defendant's conduct resulted in damage as the CFAA defines that term.

Opus's allegations of "loss," while sufficient to satisfy the "damage or loss" prong of the four part civil liability analysis, does not establish the underlying *violation* of Section 1030(a)(5)(B) which requires allegations of physical damage to the computer system at issue. As recognized in *Landmark Credit Union v. Doberstein*:

> [T]he Seventh Circuit, in the only case in which the Court of Appeals has interpreted the civil remedy in the CFAA, has noted that Congress crafted Section 1030(a)(5)(B) of the CFAA because of a concern to thwart **"attacks by disgruntled programmers who decide to trash the employer's data system on the way out" of the company**. *Int'l Airport Ctrs., L.L.C. v. Citrin,* 440 F.3d 418, 419 (7th Cir.2006) (dictum).

746 F. Supp. 2d 990, 993–94 (E.D. Wis. 2010)(citing cases)(emphasis added).

Nowhere does Opus allege facts which establish "damages" so as to invoke Section (a)(5)(B), where the only "damage and/or loss" alleged pertains to unspecified remediation efforts and prospective security measures (SAC, ¶ 72). Allegations of "damage *or* loss" under Section 1030(**c**)(4)(A)(i) in the form of remediation efforts are unrelated to the requirement that

13

Opus establish a "violation" under Section 1030**(a)**(5)(B). Opus, in its Response, simply fails to understand or address the distinction.

**WHEREFORE,** Defendants request that this Court dismiss Counts II, III and IV of the Second Amended Complaint with prejudice, and for all other relief this Court deems just and proper.

                                              Respectfully submitted,

                                              Theorem Fund Services, LLC, Stephen Giannone, Mikhail Davidyan, Melissa Bockwinkle, and Elizabeth Wright,

                                      By: */s/* Claire Gorman Kenny
                                                  One of their attorneys

                                                 Michael H. Moirano
                                                 Claire Gorman Kenny
                                                 Stephen A. Gorman
                                                 MOIRANO GORMAN KENNY, LLC
                                                 135 S. LaSalle Street, Suite 3025
                                                 Chicago, IL 60603
                                                 (312)614-1260
                                                 mmoirano@mgklaw.com
                                                 cgkenny@mgklaw.com
                                                 sgorman@mgklaw.com